Paul S. Padda, Esq. (NV Bar #10417)
Email: psp@paulpaddalaw.com
PAUL PADDA LAW, PLLC
4240 West Flamingo Road, Suite 220
Las Vegas, Nevada 89103
Tele: (702) 366-1888
Fax: (702) 366-1940
Web: paulpaddalaw.com

Attorney for the Plaintiffs

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

SIMON SINGER, individually;                )
RAO GARUDA, individually                   )
and as trustee of the GARUDA FAMILY        )
ASSET PROTECTION TRUST,                    )
                                           )
                    Plaintiffs,            )    Case No. 2:16-cv-2526-KJD-GWF
                                           )
        v.                                 )
                                           )
BRANDON STUERKE (also known as             )
"Leroy Brandon Stuerke") an individual;    )
                                           )
                    Defendant.             )
_____)

## SECOND AMENDED PETITION TO COMPEL ARBITRATION

This is a civil action, brought by way of petition, seeking the issuance of an order directing the parties appear and participate in mandatory arbitration.

### I.

### JURISDICTION AND VENUE

1.      Federal law, specifically 9 U.S.C. § 4, provides that "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in

the manner provided for in such agreement." This Court possesses subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity) and The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et. seq. (federal question).

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 since "a substantial part of the events or omissions giving rise to the claim[s] occurred" in Nevada. More importantly, 9 U.S.C. § 4 provides that "[t]he hearing and proceedings, under such an agreement, shall be within the district in which the petition for an order directing such arbitration is filed." The agreement at issue in this case requires the application of Nevada law.

## II.

## THE PARTIES

3.    Plaintiff Simon Singer (an individual and resident of California) and the Garuda Family Asset Protection Trust (established in Ohio) are the majority members of the Tax Planning Institute, LLC ("TPI"), a limited liability company founded and organized under Nevada law. Plaintiff Rao Garuda (an individual and resident of Ohio) is the trustee of the Garuda Family Asset Protection Trust ("GFAPT"). TPI is registered to transact business with the Nevada Secretary of State as a domestic limited liability company. In establishing TPI as a domestic Nevada company, the majority of members of TPI intended all disputes relating to the company to be governed by Nevada law and subject to resolution in Nevada.

4.    Defendant, Brandon Stuerke, also known formally as "Leroy Brandon Stuerke" is an adult male individual and the owner of "Automated Advisor." On information and belief, Mr. Stuerke is a resident of Colorado.

. . .

. . .

. . .

. . .

2

## III.

## OPERATIVE FACTS

5.    TPI was formed in Nevada on or about June 18, 2015.  TPI is a company that provides marketing and informational services to the financial services industry throughout the United States.  TPI is managed by "Blue Ocean Trust1."  The company has three members: the GFAPT, Mr. Singer (as an individual) and Mr. Stuerke (as an individual).

6.    According to TPI's written Operating Agreement (and the various Articles contained therein), the parties (i.e. members) "intend this Agreement to control, to the extent stated or fairly implied, the business and affairs of the Company, including the Company's governance structure and the Company's dissolution, winding up, and termination, as well as the relations among the Company's Members . . .." *See* Exhibit A.  Article 2.02 of the TPI Operating Agreement specifically provides that "[t]he parties to this Agreement have reached an understanding concerning various aspects of their business relationship with each other . . . [t]hey wish to use rights created by [Nevada] statute to record and bind themselves to that understanding." Id.  Article 8 of the Agreement, specifically Section 8.01(b), further provides "[t]he Manager has the authority or power to take any action he or she deems necessary for the benefit of the Company." Id.  Finally, Article 15 of the Agreement provides that "all breaches of [the Articles] are subject to specific enforcement, without prejudice to the right to seek damages or other remedies." Id.

7.    According to the Agreement's Article 17, '[t]his Agreement and any questions or other matter related to or arising from this Agreement will be governed by the laws of the State of Nevada."  Mr. Stuerke executed this Agreement and in so doing acknowledged that he understood "that this Agreement contains legally binding provisions" and that he was provided an "opportunity to consult with a lawyer" prior to executing/ratifying the Agreement. *See* Article 2. According to the Agreement, the company's principal place of business was listed as 848

3

North Rainbow, Suite 5195, Las Vegas, Nevada. Section 17.08 of the Operating Agreement committed Mr. Stuerke to be bound by the jurisdiction of the courts of Nevada.

8.     Prior to executing the Operating Agreement, Messrs. Garuda, Singer and Stuerke engaged the services of Las Vegas attorney Shannon Evans, Esq. to prepare the document and file the appropriate paperwork with the Nevada Secretary of State's office establishing TPI. During one conference call occurring in approximately late May 2015, the parties discussed with Ms. Evans the nature of TPI's business and the fact that many of its services and processes constituted trade secrets that if disclosed or misappropriated would harm the company and the pecuniary interests of the members. During this conversation, Messrs. Singer, Stuerke and Garuda each expressed their verbal understanding and agreement that they were collectively and individually bound by confidentiality relating to disclosure and/or use of trade secrets in their business venture and that this was a point of significance to each of them that would ensure the success of the company. Among the items identified during conversation as "trade secrets" were membership lists which TPI would create and utilize to generate business. Ms. Evans responded by stating she would include language in the Agreement addressing the fact that a member who develops an expectation contrary to the parties' agreement would be required to obtain an "amendment" of the Operating Agreement approved and consented to by the other members. This proposal was put forth by Ms. Evans in an effort to ensure the verbal agreement between Messrs. Stuerke, Singer and Garuda regarding confidentiality, which each acknowledged was critical, would be enforced/enforceable.

9.     In drafting the Operating Agreement Ms. Evans included the following language: "the failure of a Member who has or develops an expectation contrary to or in addition to the contents of this Agreement to obtain an amendment of this Agreement . . . is evidence that the expectation was not reasonable . . . ." Exhibit A (Article 2, Section 2.03(b)(iii)).

. . .

4

10.    Beginning before but continuing immediately after his execution of the Operating Agreement, Mr. Stuerke engaged in a number of misrepresentations intended to deceive Messrs. Garuda and Singer.  For example, contrary to what Mr. Stuerke represented to Messrs. Garuda and Singer, he did not have great success in recruiting prior clientele, did not experience success with another company known as "Advisors Edge Marketing," and did not have the industry success he proclaimed.  Had Messrs. Garuda and Singer known the truth about Mr. Stuerke, they would not have embarked upon a new business venture with him.  On information and belief, this is not the first time Mr. Stuerke has been accused of failing to disclose material facts and/or engaging in deceitful conduct.

11.    Following the creation of TPI in June 2015 and during its existence, Mr. Stuerke has engaged in various acts/omissions that are in direct conflict with his fiduciary obligations owed to TPI and Plaintiffs.  Both individually and cumulatively, these acts and/or omissions have harmed the financial, reputational, property and business interests of Plaintiffs.  Mr. Stuerke, for instance, has engaged in the following since his involvement with TPI:

- Has deceitfully overcharged/upcharged TPI for software services and engaged in misrepresentations in order to disguise his conduct all in an effort to enrich himself.

- Has exploited confidential membership lists (notwithstanding his prior acknowledgment that such lists constitute trade secrets and must be kept confidential) for his own benefit, including having non-authorized persons solicit clients for his competing business interests

- Deceptively charged TPI clients' credit cards while pocketing fees for himself to the direct detriment and reputational harm of TPI and Plaintiffs.

- Has over exaggerated "staff expenses" in order to pocket monies/benefits for himself at both the expense of, and harm to, the Plaintiffs.

- Has made misleading statements to potential and existing clients in order steer business away from TPI.

5

- Has slandered the reputations of Plaintiffs in order to strengthen his own business interests.

Stated simply, Mr. Stuerke, to the significant detriment of Plaintiffs, has both engaged in misrepresentations and deceitful acts intended to steer business away from TPI towards his own company ("Automated Advisor") while also misappropriating valuable trade secrets developed by Plaintiffs, all in direct violation of the agreement concerning confidentiality between the parties. While supposedly doing work for TPI and its clientele, Mr. Stuerke has in fact engaged in conduct from the inception of the founding of the company intended to enrich himself only.

12.     When confronted about his misrepresentations, deceitful conduct and acts undermining Plaintiffs' interests, Mr. Stuerke has held hostage proprietary and intellectual property (trade secrets) developed by and belonging to Plaintiffs in an effort to silence any objections and/or challenges to his conduct.

13.     While having perpetrated various fraudulent and deceitful acts harmful to the interests of Plaintiffs, Mr. Stuerke has threatened legal action in direct contravention of Article 17, Section 17.07 of the Operating Agreement which provides that "[a]ny dispute arising out of this Agreement shall be settled by [binding] arbitration." Section 15.03 of Article 15 provides that "[i]f the Company resorts to litigation to remedy a breach of this Agreement by a Member or former Member and the Company prevails in the litigation, in addition to any other remedies available to the Company under this Agreement or by law the Company may collect its reasonable attorney fees and other costs and expenses of litigation."

14.     Plaintiffs have sought to adjudicate their claims through arbitration but, to date, Mr. Stuerke has neglected and/or resisted participating in mandatory arbitration as required by the Operating Agreement governing TPI.

.  .  .

.  .  .

6

# IV.

## FIRST CAUSE OF ACTION

### (Breach Of Contract)

15.    Plaintiffs repeat, reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 14 above.

16.    Under Nevada common law, a breach of contract claim requires a plaintiff to show the following: (i) plaintiff and defendant entered into a valid contract, (ii) plaintiff performed under the contract, (iii) defendant breached the contract and (iv) plaintiff sustained damages as a result of the breach.

17.    In this case, Plaintiffs entered into a valid contract (i.e. Operating Agreement for TPI) with Mr. Stuerke on or about June 15, 2015. Plaintiffs have fulfilled all of their obligations under the Operating Agreement. Whereas, Mr. Stuerke breached that contract, as enumerated in significant detail in the Operative Facts section of this Petition, when he misappropriated trade secrets, engaged in self-dealing, made fraudulent misrepresentations and committed other deceitful acts intending to enrich and benefit only himself. All of these acts were in direct contravention of the spirit and intent of the Operating Agreement. Indeed, Article 2, Section 2.03(b)(iii) of the Operating Agreement provides that "the failure of a Member who has or develops an expectation contrary to or in addition to the contents of this Agreement to obtain an amendment of this Agreement . . . is evidence that the expectation was not reasonable . . .." What has occurred in this case is far worse than an unreasonable expectation. Instead Mr. Stuerke has disregarded the entirety of the Operating Agreement by engaging in conduct with one singular purpose in mind: benefit himself at the expense of TPI by exploiting TPI's resources and trade secrets. That is not what Plaintiff's contracted for when they agreed to Mr. Stuerke having a membership interest in TPI. As a result of Mr. Stuerke's actions, Plaintiffs have sustained significant damages.

18.    As a result of the foregoing, Plaintiffs have sustained damages in excess of $75,000.00 and have been required to retain the services of an attorney.  Plaintiffs are seeking by way of this lawsuit both compensatory and punitive damages.

## V.

## SECOND CAUSE OF ACTION

### (Breach Of Fiduciary Duty)

19.    Plaintiffs repeat, reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 18 above.

20.    Under Nevada common law, a breach of fiduciary duty claim requires a plaintiff to show the following: (i) defendant owed a fiduciary duty to plaintiff, (ii) defendant breached that duty, and (iii) plaintiff sustained damages as a proximate cause of the breach.

21.    In this case, the Operating Agreement that Mr. Stuerke executed and agreed to be bound by imposed upon him both explicit and implicit fiduciary duties towards Plaintiffs.  In fact, Article 2, Section 2.02 of the TPI Operating Agreement specifically provides that "[t]he parties to this Agreement have reached an understanding concerning various aspects of their business relationship with each other . . . [t]hey wish to use rights created by [Nevada] statute to record and bind themselves to that understanding."  In addition to the language of the Operating Agreement, Nevada law, specifically **Nevada Revised Statute ("NRS") 78.138** requires members of a limited liability company to "**act in good faith and with a view to the interests of the corporation.**"  Mr. Stuerke breached that duty, as enumerated in significant detail in the preceding section of this Petition, when he misappropriated Plaintiffs' trade secrets, engaged in self-dealing, made fraudulent misrepresentations and committed other deceitful acts intending to enrich and benefit himself.  Indeed, during a conference call with attorney Shannon Evans, Mr. Stuerke himself acknowledged the importance of maintaining confidentiality of trade secrets and agreed with Plaintiffs to maintain confidentiality in order to ensure the success of the enterprise.

8

Notwithstanding this agreement and his duties enshrined in law, Mr. Stuerke violated his fiduciary obligations to the Plaintiffs when, among other things, his misappropriated client monies for his own benefit and use and reduced the profitability of TPI by overcharging/upcharging for services. At the time Mr. Stuerke committed these acts, it was forseeable that Plaintiffs would be harmed and in fact they were and sustained damages as a result.

22.     As a result of the foregoing, Plaintiffs have sustained damages in excess of $75,000.00 and have been required to retain the services of an attorney. Plaintiffs are seeking by way of this lawsuit both compensatory and punitive damages.

## VI.

### THIRD CAUSE OF ACTION

### (Tortious Breach Of Contract)

23.     Plaintiffs repeat, reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 22 above.

24.     Under Nevada common law, a tortious breach of contract claim requires a plaintiff to show the following: (i) plaintiff and defendant entered into a valid contract, (ii) defendant owed a duty of good faith to plaintiff arising from the contract, (iii) a special element of reliance or fiduciary duty existed between plaintiff and defendant where defendant was in a superior or entrusted position, (iv) defendant breached the duty of good faith by engaging in misconduct, and (v) plaintiff sustained damages as a result of the breach.

25.     In this case, Plaintiffs and Defendant entered into a valid contract (Operating Agreement for TPI). Mr. Stuerke, the Defendant herein, owed a duty of good faith to Plaintiffs under the express terms of the Agreement and pursuant to explicit language of NRS 78.138. In fact, under the plain language of the Agreement, Mr. Stuerke was in an entrusted position and by law he was required to act in "good faith and with a view to the interests of the corporation." He

9

breached that duty by misappropriating trade secrets, engaging in self-dealing, making fraudulent misrepresentations and committing other deceitful acts intending to enrich and benefit himself. As a result of Mr. Stuerke's actions, enumerated in significant detail in the Operative Facts section of this Petition, Plaintiffs have sustained damages.

26.    As a result of the foregoing, Plaintiffs have sustained damages in excess of $75,000.00 and have been required to retain the services of an attorney.  Plaintiffs are seeking by way of this lawsuit both compensatory and punitive damages.

## VII.

## FOURTH CAUSE OF ACTION

### (Breach Of Implied Covenant Of Good Faith And Fair Dealing)

27.    Plaintiffs repeat, reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 26 above.

28.    Under Nevada common law, a breach of contract claim based upon violation of the implied covenant of good faith and fair dealing requires a plaintiff to show the following: (i) plaintiff and defendant were parties to a contract, (ii) defendant owed a duty of good faith to plaintiff, (iii) defendant breached that duty by performing in a manner that was unfaithful to the purpose of the contract and (iv) plaintiff's justified expectations were thus denied.

29.    In this case, Plaintiffs and Mr. Stuerke were parties to a contract – the Operating Agreement.  Mr. Stuerke clearly owed a duty of good faith to Plaintiffs under the express language of the Agreement and under the provisions of NRS 78.138.  Defendant breached that duty by engaging in deceitful acts, including misappropriating Plaintiffs' trade secrets – all of which are enumerated in great detail in the Operative Facts section of this Petition.  Plaintiffs' justified expectations were clearly denied.

30.    As a result of the foregoing, Plaintiffs have sustained damages in excess of $75,000.00 and have been required to retain the services of an attorney.  Plaintiffs are seeking by

way of this lawsuit both compensatory and punitive damages.

## VIII.

## FIFTH CAUSE OF ACTION

### (Constructive Fraud)

31.    Plaintiffs repeat, reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 30 above.

32.    Under Nevada common law, a constructive fraud claim requires a plaintiff to show the following: (i) defendant owed a legal or equitable duty to plaintiff arising from a fiduciary or confidential relationship and (ii) defendant breached that duty by misrepresenting or concealing a material fact and (iii) plaintiff sustained damages due to defendant's breach.

33.    In this case, Mr. Stuerke clearly owed Plaintiffs a legal duty arising from his fiduciary relationship with them as a fellow member of TPI and under the provisions of NRS 78.138. Mr. Stuerke breached that duty by concealing important and material facts from Plaintiffs, including but not limited to the matters identified in the Operative Facts section set forth in this Petition. Plaintiffs sustained damages due to Defendant's breach.

34.    As a result of the foregoing, Plaintiffs have sustained damages in excess of $75,000.00 and have been required to retain the services of an attorney. Plaintiffs are seeking by way of this lawsuit both compensatory and punitive damages.

## IX.

## SIXTH CAUSE OF ACTION

### (Fraudulent Misrepresentation)

35.    Plaintiffs repeat, reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 34 above.

36.    Under Nevada law, a plaintiff must prove (i) defendant made a false representation, (ii) that defendant knew or believed his representations were false, (iii) defendant

11

intended to induce plaintiff to act or refrain from acting upon the misrepresentations, (iv) plaintiff justifiably relied upon defendant's representations and (v) plaintiff sustained damages.

37. In this case, and in order to induce Plaintiffs to permit him continued membership in TPI, Mr. Stuerke misrepresented both his abilities and his professional/business record to Messrs. Garuda and Singer following the creation of TPI in June of 2015. Indeed, contrary to what Mr. Stuerke represented to Messrs. Garuda and Singer, he did not have great success in recruiting prior clientele, did not experience success with another company known as "Advisors Edge Marketing," and did not have the industry success he proclaimed. Had Messrs. Garuda and Singer known the truth about Mr. Stuerke and had he not engaged in affirmative misrepresentations of fact, he would never have been permitted to remain a member in TPI.

38. As a result of the foregoing, Plaintiffs have sustained damages in excess of $75,000.00 and have been required to retain the services of an attorney. Plaintiffs are seeking by way of this lawsuit both compensatory and punitive damages.

## X.

## SEVENTH CAUSE OF ACTION

### (Violation Of *Defend Trade Secrets Act Of 2016*)

39. Plaintiffs repeat, reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 38 above.

40. For their seventh claim for relief, Plaintiffs seek appropriate redress under The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et. seq.*, for misappropriation of trade secrets. Under this federal law, a plaintiff must simply prove defendant acquired a trade secret knowing he acquired it improperly or, alternatively, used a trade secret of another without consent despite reasonable measures by the plaintiff to keep such information secret.

41. Here, Messrs. Singer and Garuda worked hard to develop a number of trade

12

secrets that made TPI a success and industry leader. Mr. Stuerke improperly utilized the techniques, methods, processes, procedures and programs developed by Plaintiffs during the administration of TPI (for marketing to the financial services industry) for his own economic benefit without the consent, let alone knowledge, of Plaintiffs. Despite reasonable measures to keep the proprietary and trade information secret, such as an explicit agreement between the parties during the conference call with attorney Shannon Evans (as well as several other subsequent discussions between the parties) and the explicit language contained in Article 2, Section 2.03(b)(iii) of the Operating Agreement, Mr. Stuerke, without the consent or knowledge of Plaintiffs, disregarded his obligations and exploited the trade secrets to his own exclusive benefit. Indeed, Mr. Stuerke used Plaintiffs' own trade secrets to compete against Plaintiffs and TPI in order to enrich himself, despite having previously agreed to never do so. It was reasonable for Plaintiffs to expect Mr. Stuerke to honor the agreement to protect trade secrets reached in the presence of an attorney (officer of the court) as this measure had the imprimatur of a "reasonable measure" or effort to protect secret information given that it was witnessed by a disinterested and neutral party. Following the conference call with Ms. Evans referenced in this Petition, the parties had several other discussions at various times during the proceeding year following June 18, 2015 in which they agreed to safeguard and protect trade secrets. As a result of these discussions at which explicit agreements were reached with the expectation of furthering the business interests of TPI and the parties, Mr. Stuerke was obligated to restrict his use/disclosure of trade secrets to uses that benefitted TPI and the parties collectively rather than to the detriment of TPI and Plaintiffs.

42.    As a result of the foregoing, Plaintiffs have sustained damages from the period May 11, 2016 (the effective date of the enactment of The Defend Trade Secrets Act) onwards and have been required to retain the services of an attorney.

.   .   .

## XI.

## RELIEF REQUESTED

43.    Wherefore, in light of the foregoing, Plaintiffs respectfully request that the Court, pursuant to 9 U.S.C. § 4, issue an order compelling arbitration in accordance with the terms of the written agreement at issue in this case.

Respectfully submitted,

/s/ *Paul S. Padda*

_____

Paul S. Padda, Esq.

Attorney for Plaintiff

Dated: July 7, 2017

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 7, 2017, a copy of the foregoing document was served via the Court's electronic filing system (CM/ECF) upon all counsel and parties of record in this matter.

/s/ *Paul S. Padda*

_____

Paul S. Padda, Esq

14

# EXHIBIT A

# EXHIBIT A

OPERATING AGREEMENT
OF
TAX PLANNING INSTITUTE, LLC,
A NEVADA LIMITED LIABILITY COMPANY
ORGANIZED UNDER NEVADA REVISED STATUTES CHAPTER 86

ARTICLE I
INITIAL DATE, PARTIES, AUTHORIZATION, AND PURPOSE
OF THIS AGREEMENT

**Section 1.01   Initial Date; Initial Parties**

. This Agreement is made and entered into to be effective on _____ (the "Effective Date") and is initially agreed to by Tax Planning Institute, LLC, a Nevada Limited Liability Company ("the Company") and all persons who on that date are Members of the Company.

**Section 1.02   Subsequent Parties; Assent as a Precondition to Becoming a Member or to Obtaining Rights to Become a Member**

(a)   No person may become a Member of the Company without first assenting to and signing this Agreement. Any act by the Company to offer or provide Member status, or reflect that status in the Company's Required Records, automatically includes the condition that the person becoming a Member first assent to and sign this Agreement.

(b)   If:

(i)   the Company offers, makes, or signs a Contribution Agreement or Contribution Allowance Agreement, or any other agreement that permits or requires a person to make a contribution and become a Member, and

(ii)   the other party to the Contribution Agreement, Contribution Allowance Agreement, or other agreement is not already a Member and has not already assented to and signed this Agreement,

then the Company's action automatically includes the condition that the other party assent to and sign this Agreement before that person actually makes a contribution or becomes a Member.

(c)   The Company is obligated not to accept a contribution from, or accord Member status to, any person who has not first assented to and signed this Agreement. The Company's acceptance of a contribution from a person who has not signed this Agreement does not waive that person's obligation to sign this Agreement.

(d)   No assignment of any Governance Unit is effective unless the assignment complies with Section 11.02 and the assignee has assented to and signed this Agreement.

**Section 1.03   Authorization of this Agreement**

This Agreement is made Under Nevada Revised Statutes Chapter 86.

## ARTICLE II
## BACKGROUND OF THIS AGREEMENT

### Section 2.01    History and Nature of the Company

The Company was organized in Nevada and will be engaged in any business its Manager chooses to pursue. As of the initial date of this Agreement, the Company's principal place of business is 848 N. Rainbow #5195, Las Vegas, NV 89107.

### Section 2.02    Intent of This Agreement

(a)    The parties to this Agreement have reached an understanding concerning various aspects of (i) their business relationship with each other and (ii) the organization and operation of the Company and its business. They wish to use rights created by statute to record and bind themselves to that understanding.

(b)    The parties intend this Agreement to control, to the extent stated or fairly implied, the business and affairs of the Company, including the Company's governance structure and the Company's dissolution, winding up, and termination, as well as the relations among the Company's Members and persons who have signed Contribution Agreements and Contribution Allowance Agreements.

### Section 2.03    Invalidity and Unreasonableness of Expectations Not Included in This Agreement

(a)    The Members fear the uncertainty and the potential for discord that would exist if:

(i)    the unstated expectation of one or more Members can be used to gain advantage through litigation, or

(ii)    expectations stated or expressed outside the confines of this Agreement can become actionable even though not all Members agree with those expectations or have assented to them and even though some Members have expressed or may harbor conflicting expectations.

(b)    The Members therefore agree that:

(i)    it is unreasonable for any Member to have or rely on an expectation that is not reflected in this Agreement;

(ii)    any Member who has or develops an expectation contrary to or in addition to the contents of this Agreement has a duty to

(A)    immediately inform the Manager and all other Members, and

(B)    promptly seek to have this Agreement amended to reflect the expectation;

(iii)    the failure of a Member who has or develops an expectation contrary to or in addition to the contents of this Agreement to obtain an amendment of this Agreement as provided in Section 2.03(b)(ii) is evidence that the expectation was not reasonable and estops that Member from asserting that expectation as a basis for any claim against the Company or any other Member;

(iv)    no Member has a duty to agree to an amendment proposed under Section

2.03(b)(ii) if the Member in good faith

        (A)     holds an inconsistent expectation, or
        (B)     believes that the amendment is not in the best interests of the Company
or is contrary to the legitimate self-interests of the Member.

### Section 2.04    Advice of Counsel

Each person signing this Agreement:

        (a)     understands that this Agreement contains legally binding provisions,

        (b)     has had the opportunity to consult with a lawyer or is a lawyer with experience in entity formation, and

        (c)     has either consulted a lawyer or consciously decided not to consult a lawyer. The same attorney has represented all of the members in this matter. Before representing those parties, the attorney consulted with each party concerning the implications of the common representation, including the advantages and the risks involved, and each party consented to the common representation.

### ARTICLE III
### RELATIONSHIP OF THIS AGREEMENT
### TO THE DEFAULT RULES PROVIDED BY THE LLC ACT, NRS CHAPTER 86
### AND TO THE ARTICLES OF ORGANIZATION

### Section 3.01    Relationship of This Agreement to the Default Rules Provided by the LLC Act, NRS Chapter 86

Regardless of whether this Agreement specifically refers to particular default rules:

        (a)     if any provision of this Agreement conflicts with a default rule, the provision of this Agreement controls and the default rule is modified or negated accordingly, and

        (b)     if is necessary to construe a default rule as modified or negated in order to effectuate any provision of this Agreement, the default rule is modified or negated accordingly.

### Section 3.02    Relationship Between This Agreement and the Articles of Organization

If a provision of this Agreement differs from a provision of the Company's articles of organization, then to the extent allowed by law this operating agreement will govern.

### ARTICLE IV
### CAPITAL STRUCTURE: MEMBERSHIP AND CONTRIBUTIONS

### Section 4.01    Membership, Governance Units, and Financial Units

        (a)     Ownership rights in the Company are reflected in Governance Units and Financial Units, as recorded in the Required Records. The initial member's ownership interest will necessarily consist of at least one Governance Unit and may include one or more Financial Units. However, in the event a deceased Member's trust or heirs own an interest in the Company, such substituted

Member shall not own Governance Units. Likewise, in the event of the divorce of a Member, upon which the Member's spouse owns an interest in the Company, such substituted Member shall not own Governance Units.

(b)    On matters subject to a vote of the Members, each Governance Unit has one vote. Subject to Sections 5.05 and 5.08, each Financial Unit has equal rights with every other Financial Unit with respect to sharing of profits and losses and with respect to distributions.

(c)    Governance Units are transferable only as provided in Section 11.02. Financial Units are transferable only as provided in Section 11.01. The Company will recognize any assignment of a financial rights only when the assignment is in the form of the assignment of a Capital Interest or of one or more Financial Units, and only to the extent the assignment complied with Section 11.01.

(d)    The Company will not issue any certificates of units, but will at the written request of a Member or the owner of Financial Units provide certified statements of Units owned, stating the number of Governance Units and Financial Units owned by the requestor as of the date the statement is provided.

(e)    Two-Thirds (2/3) of the Governance Units may elect in writing to grant governance units to a substituted member, but are not required to, pursuant to Section 4.01(a).

## Section 4.02   Issuance of Units by the Company

(a)    The Manager will determine when and for what consideration the Company will issue Units.  For each Member, the Required Records state the value and nature of the contribution received by the Company and the number of Governance and Financial Units received in return by the Member.

(b)    No Member has the right to make additional contributions or obtain additional Units, and each Member specifically waives any preemptive rights.

## Section 4.03   No Right of Company to Require Additional Contributions

Each initial Member listed herein has contributed, to the initial capital of the Company, the sum of $1,000. Capital contributions to the Company shall not bear interest. An individual capital account shall be maintained for each Member.  Except as provided in a Contribution Agreement, the Company has no right to require any Member to make additional contributions. This section does not release any Member from any obligation or promise of future performance that the Company accepted as a contribution.

## Section 4.04   Company's Right to Accept Additional Contributions Limited

(a)    The Company may not accept additional contributions, make Contribution Agreements or Contribution Allowance agreements, or create or allocate additional Governance Units except as approved by a two-thirds (2/3) vote of the Members holding Governance Units.

(b)    To be effective, the approval required by this section must specify the number of Units authorized. The approval may, but need not, specify the amount, nature, and value of the consideration to be received, the identity of the contributor or would-be contributor, a deadline by which the authorized contribution must be received, or any other condition on the approval.

(c)    Approval under this section is not effective to authorize the creation of a separate

class or series of Governance Units or Financial Units, or to authorize a deviation from the requirements of Section 4.02(b).

## Section 4.05   No Rights of Redemption or Return of Contribution

Subject to Section 11.03, no person has a right to have its Governance or Financial Units redeemed or its contribution returned prior to the termination of the Company, even if the person is a Member who dissociates prior to termination of the Company. Even at termination, the right to return of contribution or redemption is subject to Article XIII.

## ARTICLE V
## CAPITAL STRUCTURE:
## PROFITS, LOSSES, DISTRIBUTIONS,
## AND TRANSACTIONS BETWEEN MEMBERS AND THE COMPANY

## Section 5.01   Allocation of Profits and Losses

(a)      Except as stated in Sections 5.02 and 5.08, profits and losses are allocated each fiscal year according to the number of Financial Units owned, as reflected in the Required Records.

(b)      For any Financial Unit not owned by the same person for the entire fiscal year, the allocation will be prorated.

## Section 5.02   No Right to Interim Distributions

No Member or owner of Financial Units has a right to any distribution prior to the termination of the Company.

## Section 5.03   Allocation of Interim Distributions

(a)      Except as stated in Sections 5.02 and  5.08, interim distributions, if made, will be allocated according to the number of Financial Units owned, as reflected in the Required Records.

(b)      For any Financial Unit not owned by the same person for the entire fiscal year, the allocation will be prorated.

## Section 5.04   No Right to Distribution Upon Dissociation

A Member's dissociation does not entitle the Member to any distribution, regardless of whether the dissociation causes the Company to dissolve.

## Section 5.05   Distributions Upon Termination of the Company

(a)      At the Termination of the Company, subject to Article XIII and after the Company has satisfied or provided for the satisfaction of all the Company's debts and other obligations, the Company's assets will be distributed in cash to the Members and any dissociated Members whose interests have not been previously redeemed as provided in Section 13.03 as follows:

(i)      first, in discharge of their respective Capital Interests; and

(ii)      then, in proportion to their Financial Units.

(b)    If the Company lacks sufficient assets to make the distributions described in Section 5.05(a), the Company will make distributions in proportion to the amount in the respective Capital Interests of the Members and of dissociated Members whose interests have not been previously redeemed.

## Section 5.06    Distributions in Kind

(a)    No Member or owner of Financial Units has a right to any distribution in any form other than money.

(b)    The Company may not make a distribution in kind unless

(i)    the person receiving the in-kind distribution consents,

(ii)   all owners of Financial Units receive undivided interests in the same property, or

(iii)  all owners of Financial Units receive, in proportion to their rights to distribution, interests in substantially equivalent property and agrees in writing.

## Section 5.07    Distributions Subject to Set-Off by the Company

All distributions are subject to set-off by the Company:

(a)    in the case of a Member, for any past-due obligation of the Member to the Company; and

(b)    in the case of a non-Member who owns one or more Financial Units, only to the extent the non-Member has agreed to be liable for the obligations of the Member who originally owned the Financial Unit or Units.

## Section 5.08    Loans From and Other Transactions With Members and Manager

(a)    With the approval of the Manager, the Company may borrow money from and enter into other transactions with a Member who is not a Manager or trustee of Blue Ocean Trust.

(b)    The Company may enter into transactions and other undertakings (including borrowing money) with a Manager, whether or not the Manager is a Member, with the written approval of

(i)    the Members owning a majority of Governance Units owned by Disinterested Members (regardless of whether, for other purposes, the Disinterested Members own enough Governance Units to constitute a quorum under Section 9.08 or to accomplish action with a meeting under Section 9.09).

To be valid, the approval must be based on all material information concerning both the undertaking and the Interested Manager's relationship to the undertaking. This paragraph does not apply to the compensation arrangements for the Manager.

(c)    On account of loans made, or transactions performed, by a Member under this section, the Manager may increase, temporarily or permanently, a Member's right to share in profits and distributions.

(d)    Borrowing from or engaging in other transactions with one or more Members (whether or not the Member is a Manager) does not obligate the Company to provide comparable opportunities to other Members.

## ARTICLE VI
## TAX MATTERS

### Section 6.01    Tax Characterization and Returns

(a)    The Members acknowledge that the Company will be treated as a "partnership" for federal and Nevada state tax purposes. All provisions of this Agreement, the Company's articles of organization, and the Company's operating agreement are to be construed so as to preserve that tax status.

(b)    Within ninety (90) days after the end of each Fiscal Year, the Manager will cause to be delivered to each person who was a Member at any time during such Fiscal Year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of each Member's federal or state income tax (or information) returns, including a statement showing each Member's share of income, gain or loss, and credits for the Fiscal Year.

### Section 6.02    Capital Accounts

The Company will establish a Capital Account for each Member and will maintain each Account according to the following rules:

(a)    Maintenance. The Company will maintain the Capital Accounts in accordance with Treasury Regulations § 1.704-1(b)(2)(iv).

(b)    Liquidation Payments. If the Company liquidates itself or a Member's Membership interest, subject to Article XIII, the Company will make liquidating distributions in accordance with Section 4.05.

(c)    Negative Capital Account and Qualified Income Offset. A Member is not be liable to fund any deficit in the Member's Capital Account at any time. Notwithstanding any other provision in this Agreement, if a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations § 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), and the unexpected adjustment, allocation, or distribution results in a deficit balance in the Capital Account for the Member, the Member will be allocated items of income and gain in an amount and manner sufficient to eliminate the deficit balance or the increase in the deficit balance as quickly as possible. It is intended that this subdivision will meet the requirements of a "qualified income offset" as defined in Treasury Regulations § 1.704-1(b)(2)(ii)(d), and this subdivision is to be interpreted and applied consistent with that intention.

(d)    Nonrecourse Deductions. If a Member's Capital Account has a deficit balance at any time and the deficit or increase in deficit was caused by the allocation of nonrecourse deductions as defined in Treasury Regulations § 1.704-2(b), then beginning in the first taxable year of the Company in which there are nonrecourse deductions or in which the Company makes a distribution of proceeds of a nonrecourse liability that are allocable to an increase in minimum gain as defined in Treasury Regulations § 1.704-2(d) and thereafter throughout the full term of the Company, the following rules shall apply:

(i)    Nonrecourse deductions shall be allocated to the Members in a manner that is reasonably consistent with the allocations that have substantial economic effect as defined in Treasury Regulations § 1.704-1 or some other significant item attributable to the property securing the nonrecourse liabilities, if applicable; and

(ii)    If there is a net decrease in minimum gain for a taxable year, each Member will be allocated items of Company income and gain for that year equal to that Member's share of the net decrease in minimum gain as defined in Treasury Regulations § 1.704-2(g)(2).

### Section 6.03    Accounting Decisions

(a)    The Manager will make all decisions as to accounting matters, and

(b)    The Manager may cause the Company to make whatever elections the Company may make under the Code, including the election referred to in Section 754 of the Code to adjust the basis of Company assets.

### Section 6.04    "Tax Matters Partner"

The Manager will designate a Member to act on behalf of the Company as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

### ARTICLE VII
### GOVERNANCE: MANAGER

### Section 7.01    Designation of Manager

The Company will be managed by a Manager, Blue Ocean Trust, who will serve until either removal by a majority vote of the Members or resignation. If Manager resigns or is otherwise unable or unwilling to serve as Manager, a replacement manager will be selected by a majority vote of the members holding governance units. The Manager will serve without compensation, unless two-thirds (2/3) of the Governance Members determine that reasonable compensation is necessary.

### Section 7.02    Removal and Resignation of Manager

(a)    The Members may remove the Manager, without having to possess, state, or prove cause, by an act of the Members owning two-thirds (2/3) of the Governance Units. The removal of a Manager without stating or proving cause does not bar a later claim that the Manager engaged in misconduct while a Manager.

(b)    The Manager may resign by providing written notice to all Members. The resignation takes effect 5 days after the date the Manager gives notice to all Members, or at a later date stated in the notice of resignation.

### Section 7.03    Interim Management and Replacement Manager

(a)    Once the resignation of the Manager is effective or the Members remove the Manager, the Company will be managed by the Members holding governance units or until the Members choose a replacement Manager as provided in Section 7.03(b).

(b)    The Members will elect a replacement Manager at a properly scheduled meeting of the Members. The vote of Members holding two-thirds (2/3) of the Membership Units [Governance Units] is necessary to elect a replacement Manager. If the Members act through a meeting to remove the Manager under Section 7.02(a), the same meeting that votes removal may also elect a replacement Manager. Once elected, the replacement Manager will have all of the powers and duties of the initial Manager.

### Section 7.04   Authority of the Manager

(a)    Subject to Article VIII and except as stated in Section 7.04(b), the Manager has sole authority to manage the Company and is authorized to make any contracts, enter into any transactions, and make and obtain any commitments on behalf of the Company to conduct or further the Company's business.

(b)    The Manager may in writing delegate to an employee of the Company any of the Manager's responsibilities and authority except the authority to borrow money. This provision does not alter or waive any duty that a Manager may have to the Company concerning the Manager's exercise of management authority.

### Section 7.05   Duties of Manager

(a)    The Manager must discharge his, her, or its duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Manager reasonably believes to be in the best interests of the Company.

(b)    A Manager may rely on information received from other persons if that reliance is consistent with the Manager's duties under Section 7.06.

### Section 7.06   Nonliability of Manager for Acts or Omissions in Official Capacity

The Manager is released from liability for damages and other monetary relief to the full extent permitted by Nevada Revised Statutes Chapter 86. This release does protect a manager who is a member from being required by a court to purchase the membership interest of a member who successfully contends that the manager-member has committed actionable oppressive acts. No amendment or repeal of this section affects any liability or alleged liability of any Manager for any acts, omissions, or conduct that occurred prior to the amendment or repeal.

### Section 7.07   No Authority of Members

Except as authorized by the Manager in writing, no Member is an agent of the Company or has the authority to make any contracts, enter into any transactions, or make any commitments on behalf of the Company.

### Section 7.08   Power of Attorney

All members, by the execution of this agreement, appoint the Manager as their true and lawful attorney and agent, with full power and authority in their name, place and stead to make, execute, swear to, acknowledge, deliver, file and record:

(a)    The articles of organization as required by law, including any amendments required for the transfer of company interests, any admission, substitution or deletion of members and the

continuation of the company after the death, bankruptcy, insanity, incompetence, retirement or withdrawal of a member and the appointment of a substitute member;

(b)     any cancellation of this agreement and/or articles of dissolution as required by law upon the dissolution and termination of the company;

(c)     all certificates, instruments, documents and other papers (including, without limitation, any business certificate, fictitious name certificate, articles of incorporation, certificate of limited partnership and additional powers of attorney) and amendments thereto which may from time to time be required under the laws of the United States of America, the State of Nevada or any other jurisdiction in which the company determines to do business, or required by any political sub-division or agency of any of the foregoing or otherwise, or which the Manager shall deem appropriate or necessary, to qualify or continue the qualification of the company as a limited liability company, to carry on the objects and intent of this agreement, to conduct the business and affairs of the company, to admit, substitute or delete members and to effect the termination and dissolution of the company;

(d)     all instruments which the Manager deems appropriate to reflect a change or modification of the company in accordance with the terms of this agreement; and

(e)     all conveyances and other instruments which the Manager shall deem appropriate to effect the transfer of company interests, to admit, substitute or delete members, to sell, exchange or dispose of assets or properties of the company and to reflect the dissolution and termination of the company.

## ARTICLE VIII
## LIMITATIONS ON MANAGERIAL POWERS

### Section 8.01   Actions Requiring Unanimous or Supermajority Consent

(a)     The Manager has no authority or power to take the following actions unless first approved by an act of the Members :

      (i)     the issuance of any additional Governance Units must be approved by two-thirds (2/3) of the Governance Units Members;

      (ii)     the issuance of any additional Financial Units must be approved by a majority of the Financial Units Members;

      (iii)     the admission of a new outside Member, from the sale of a membership interest must be approved by a majority of the Governance Units Members.

(b)     The Manager has the authority or power to take any action he or she deems necessary for the benefit of the Company.

### Section 8.02   Other Provisions Limiting Managerial Authority

When some other provision of this Agreement states procedures for taking particular actions or accomplishing specified results, that provision states the sole method for taking that action or accomplishing that result.

## ARTICLE IX
## ACTS OF MEMBERS AND MEMBER MEETINGS

### Section 9.01   Acts of Members

Except to the extent that Nevada Revised Statutes Chapter 86, the articles of organization, or this operating agreement require otherwise, an act of the Members consists of either:

(a)   a majority vote of the Governance Units present at a properly called meeting of the Members, when a quorum is present, or

(b)   written action without a meeting, as provided in Section 9.09.

### Section 9.02   Required Annual Meeting

The Members will meet at least annually.  The Manager will give notice of this annual meeting, complying with Section 9.04.

### Section 9.03   Special Meetings

(a)   A special meeting of the Members may be called for any purpose or purposes at any time by an act of the Manager under Section 7.05(a), or by one or more Members owning at least ten percent (10%) of the Governance Units or Financial Units the Company entitled to vote.

(b)   For any special meeting not called by an act of the Manager, those persons who are demanding the special meeting must give written notice to the Manager of the Company specifying the purposes of the meeting.  Within thirty (30) days after the Manager receives a demand under this paragraph, the Manager must call a special meeting of the Members.  If the Manager fails to call the special meeting as required by this paragraph, the person or persons making the demand may, at the expense of the Company, call the meeting by giving the notice described in Section 9.04.

### Section 9.04   Notice of Meetings

Written notice of each meeting of the Members, stating the date, time, and place and, in the case of a special meeting, the purpose or purposes, must be given to every Member at least ten (10) days and not more than sixty (60) days prior to the meeting. The business transacted at a special meeting of Members is limited to the purposes stated in the notice of the meeting.

### Section 9.05   Location and Conduct of the Meetings; Adjournments

(a)   Each meeting of the Members will be held at the Company's principal place of business or at some other suitable location within the same county, as designated by the Manager.

(b)   The Manager will chair each meeting of the Members.

(c)   Any meeting of the Members may be adjourned from time to time to another date and time and, subject to Section 9.05(a), to another place.  If at the time of adjournment the person chairing the meeting announces the date, time, and place at which the meeting will be reconvened, it is not necessary to give any further notice of the reconvening.

## Section 9.06   Waiver of Notice

(a)    A Member may waive notice of the date, time, place, and purpose or purposes of a meeting of Members. A waiver may be made before, at, or after the meeting, in writing, orally, or by attendance.

(b)    Attendance by a Member at a meeting is a waiver of notice of that meeting, unless the Member objects at the beginning of the meeting to the transaction of business because the meeting is not properly called or convened, or objects before a vote on an item of business because the item may not properly be considered at that meeting and does not participate in the consideration of the item at that meeting.

## Section 9.07   Proxies

(a)    A Member may cast or authorize the casting of a vote by filing a written appointment of a revocable proxy with the Manager of the Company at or before the meeting at which the appointment is to be effective. The Member may sign or authorize the written appointment by telegram, cablegram, or other means of electronic transmission stating, or submitted with information sufficient to determine, that the Member authorized the transmission. Any copy, facsimile, telecommunication, or other reproduction of the original of either the writing or the transmission may be used in lieu of the original, if it is a complete and legible reproduction of the entire original.

(b)    A member may not grant or appoint an irrevocable proxy.

## Section 9.08   Quorum

For any meeting of the Members, a quorum consists of a majority of the Governance Units. If a quorum is present when a properly called meeting is convened, the Members present may continue to transact business until adjournment, even though the departure of Members originally present leaves less than the proportion otherwise required for a quorum.

## Section 9.09   Action Without a Meeting

Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting by written action signed by the Members who own the number of Governance Units equal to the number of Units that would be required to take the same action at a meeting of the Members at which all Members were present. The written action is effective when signed by Members owning the required number of Governance Units, unless a different effective time is provided in the written action. When written action is taken by less than all Members who own Governance Units, the Company will immediately notify all Members of the action's text and effective date. Failure to provide the notice does not invalidate the written action.

## ARTICLE X
## REQUIRED RECORDS

## Section 10.01 Contents and Location of Required Records

The Company will maintain at its principal place of business, or at some other location chosen by the Manager, the following records:

1.   The Operating Agreement

2.   Last 3 years Tax Returns or K-1's

3.   Any other records required by law

## Section 10.02 Access to Required Records

(a)   After giving reasonable advance notice to the Company, any Member may inspect and review the Required Records and may, at the Member's expense, have the Company make copies of any portion or all of the Records.

(b)   Unless the Company agrees otherwise, all Member access to the Required Records must take place during the Company's regular business hours. The Company may impose additional reasonable conditions and restrictions on Members' access to the Required Records, including specifying the amount of advance notice a Member must give and the charges imposed for copying.

## ARTICLE XI
## TRANSFER RESTRICTIONS

## Section 11.01 Financial Units and Capital Interests

(a)   Any owner of Financial Units or a Capital Interest may assign any or all of those Units or that Interest as to the Company. An assignment covered by this paragraph is effective only when the Company has received notice of the assignment and upon the unanimous approval of all members, financial and governance units, and manager. However, a member may transfer financial units to either an "revocable trust" or "Nevada asset protected trust" which is wholly owned by the member and his or her spouse, if any, without consent.

(b)   An assignment under Section 11.01(a) creates rights under this Agreement only to the extent this Agreement expressly and specifically provides. An amendment to this Agreement may affect the rights of assignees, even if the amendment is made after the assignment. An assignee of a Capital Interest takes the assignment subject to any claims or offsets the Company has against the Member who originally owned the Capital Interest, regardless of whether those claims or offsets exist at the time of the assignment or arise afterwards.

(c)   In the event that a member's financial units become owned by the member's heirs, via a trust or outright, such heirs shall not have governing units.

## Section 11.02 Membership Interests and Governance Units

(a)   Before assigning any Membership Units or Governance Units to anyone (other than a grantor trust), a Member must first offer said Membership Units or Governance Units to the non-offering Members in relation to their pro-rata Membership or Governance Unit ownership interest.

(b)   A member must have the unanimous Consent of all Governance Units and manager before assigning any Membership Unit or Governance Unit;

(i)   to a Member, if the assignment will leave the assignor/Member with no Governance Units;

(ii)     to a person not already a Member, regardless of whether the assignment will leave the assignor/Member with no Governance Units.

(c)     If an assignment covered by Section 11.02(b)(ii) receives the required unanimous Consent of all members and manager and takes effect,

(i)     the assignment will cause the assignor/Member to become a Dissociated Member, and

(ii)     the unanimous Consent of all members and manager obtained to satisfy Section 11.02(b)(ii) will also satisfy the requirement for unanimous Consent established by Section 14.01 and triggered by the assignor/Member's dissociation from the Company.

(d)     An assignment made in violation of Section 11.02(b) is void. Section 11.02(b) does not limit the right or power of a Member to grant a revocable proxy under Section 9.07.

## Section 11.03 Right to Put Complete Membership Interest When Transfer Consent Is Unreasonably Withheld

(a)     A would-be assignor may require the Company to redeem the Governance and Financial Units at the price and on the terms of the offer to purchase submitted under this Section if:

(i)     a Member proposes to assign all its Governance and Financial Units;

(ii)     the proposed assignee meets the suitability requirements stated in Section 11.03(b);

(iii)     the proposed assignee has made a bona fide, written, enforceable offer to purchase; and

(iv)     within 30 days of receiving written notice of the proposed assignment, including a copy of the offer referred to in clause (iii) above,

(A)     neither the Company nor the other Members give notice that they are exercising the rights stated in Section 11.02(a), and

(B)     the assignment does not receive the Unanimous Consent required by Section 11.02(b).

To require the redemption, the would-be transferor must make a written demand on the Company within ten (10) days after the expiration of the deadline for approval stated in Section 11.03(a)(iv).

(b)     To be suitable to trigger the "put" rights stated in Section 11.03(a), the offer to purchase must show:

proof of creditworthiness in the event liability accrues for wrongful distributions, history of experience in business, and evidence of competence and noninvolvement with any Company competitor.

## Section 11.04  Transfer of Membership Interest in Event of Member's Divorce or Separation

In the event a Member who is married has the marriage dissolved or enters into a separation agreement, and to the extent that the Member's interest is deemed to be community property, this act shall constitute a triggering event to the extent of the interest sought to be transferred under the Decree of Divorce or Separation Agreement.  Upon such event, the remaining Members shall have the right, exercisable at any time after the triggering event, and upon thirty (30) days notice to the spouse of the divorcing/separating member, to purchase the portion of membership interest allocated to the spouse of the Member at the price set forth in Section 11.06.

If the remaining Members do not exercise their right to purchase the spouse's membership interest, the spouse shall remain a Member, even if he or she is not a licensed attorney and shall be bound by the terms of this agreement.  Such spouse shall not hold Governance Units, unless granted pursuant to Section 4.01(e).

## Section 11.05  Transfer of Membership Interest in Event of Member's Death

In the event a Member dies and the Member's spouse is to inherit that Member's share, the spouse shall be presumed to keep the Member's share.  Only if the Member's spouse sends written notice to the Manager that the Member's spouse intends to sell the deceased Member's share, shall the remaining Members have the option to purchase the shares pursuant to Section 11.02 at the price set forth in Section 11.06.

In the event a Member dies, and the Member's heirs are any persons, trust or charity other than a spouse,  that act shall constitute a triggering event and the remaining members shall have the right, exercisable at any time after the triggering event, and upon thirty (30) days notice to the deceased Member's executor or administrator, to purchase the deceased Member's share at the price set forth in Section 11.06.

If the remaining Members do not exercise their right to purchase the deceased Member's interest, the heirs or trust of the deceased Member shall own the interest and shall be bound by the terms of this agreement.  Such estate, trust or heirs shall not hold Governance Units, unless granted pursuant to Section 4.01(e).

## Section 11.06  Purchase Price

     (a)     Purchase Price.  The purchase price paid for a Membership Interest pursuant to the terms of this Agreement shall be calculated based on the member's pro-rata share of the company value as determined by Section 11.06(b).

     (b)     Company Value.  The Company's value shall be the fair market value of the Company's tangible and intangible property, less liabilities.  In no event shall the Member's interest to value be less than the capital contribution of the disassociating or selling Member.  All Members holding Governance Units and the disassociating Member, his or her executor or administrator, or such Member's spouse in the event of a divorce or separation, may unanimously agree as to the Company's value and no appraisal will be required.  Otherwise, in the absence of an agreement, the fair market value will be determined by an average of two appraisals.  One appraisal will be paid for by the selling Member and the other appraisal will be paid for by the purchasing Member(s).

### Section 11.07 Damages and Set-Offs

(a)     No Member has the right to dissociate before the end of the duration of the Company as stated in the articles of organization. If a Member dissociates before that time and the dissociation results from volitional conduct of the Member that could reasonably be characterized as resignation, retirement, or withdrawal, then the Dissociated Member is liable to the Company for damages resulting from the wrongful dissociation.

(b)     The Company may set off any amounts or obligations owed by a Dissociated Member to the Company against any amounts due the dissociated Member, regardless of the cause of a Member's dissociation and regardless of whether the Member's Dissociation results in dissolution of the Company.

### ARTICLE XII
### MEMBER DISSOCIATION: EFFECT ON THE COMPANY

### Section 12.01 Dissolution Avoidance

A Member's dissociation will not cause the Company to dissolve if

(a)     more than one Member remains, or, if only one Member remains, within 100 days after the dissociation the Company issues at least one Governance Unit to a new Member, and

(b)     within 100 days after the dissociation Unanimous Consent is obtained to avoid dissolution and to continue the existence and business of the Company.

### Section 12.02 Agreement to Give Dissolution Avoidance Consent

(a)     Subject to Section 12.02(b), within 30 days after the Dissociation of a Member each remaining Member will consent to avoid dissolution and continue the existence and business of the Company. Each Member will give the consent in a form satisfactory to the Manager.

(b)     The consent required by this section may be given through the holder of a revocable proxy authorized in Section 9.07. By this Agreement, each Member appoints the Manager as the holder of the Member's proxy for this purpose.

### ARTICLE XIII
### BUSINESS CONTINUATION IN THE EVENT OF DISSOLUTION

### Section 13.01 Triggering Events

(a)     Subject only to Section 13.01(b), if the Company dissolves for any reason at any time, the affairs of the Company will be wound up and its legal existence terminated by merging the Company into a Successor LLC, as provided in Section 13.02.

(b)     Section 13.02 will not apply and the Company will be liquidated under the applicable provisions of the Nevada Revised Statutes Chapter 86 if

   (i)     within 30 days after the dissolution Members owning a majority of all Governance Units notify the Company in writing that they object to proceeding under Section 13.02,

    (ii)     more than 60 years have passed since the initial date of this Agreement

## Section 13.02 Business Continuity

(a)    Subject only to Section 13.01(b), as soon as dissolution occurs the Manager will:

    (i)     organize the Successor LLC,

    (ii)     develop a plan of merger that complies with Section 13.02(c) for the Company and the Successor LLC,

    (iii)    approve the plan of merger on behalf of the Company and submit the plan to the Company's Members for approval at a properly called meeting of the Members,

    (iv)    cause the Manager of the Successor LLC to approve the plan of merger and submit the plan to the Members of the Successor LLC for approval, and

    (v)     cause the Members of the Successor LLC to approve the plan of merger.

(b)    When the plan of merger is presented to the Members for approval, the Members will, subject to Section 13.03,

    (i)     vote to approve the plan, and

    (ii)     sign any documents that the plan requires them to sign or whose execution is necessary to proper implementation of the plan.

(c)    The plan of merger must provide that

    (i)     the Successor LLC will be the surviving organization in the merger,

    (ii)     all the assets and liabilities of the Company will be transferred to the Successor LLC and the Successor LLC will continue the business of the Company under the same name,

    (iii)    all Capital Interests (whether or not assigned) and all Governance Units and Financial Units will be converted into interests in the Successor LLC having substantially identical terms,

    (iv)    the Successor LLC will have articles of organization and an operating agreement that are substantially equivalent to the articles of organization and operating agreement in effect for the Company immediately prior to the merger, and

    (v)     the rights of any dissociated Members as described in Article XII will apply against the Successor LLC.

(d)    When the Company is winding down its affairs, the Company will do so pursuant to the requirements of Nevada Revised Statutes.

## Section 13.03  Dissenters' Rights

(a)    Any person who is a Member at the time of dissolution can dissent from the implementation of the business continuation agreement stated in this section by giving written notice to the Company within five (5) days after the Manager presents the plan for a vote and by voting against the proposed merger.

(b)    A Member who properly dissents under Section 12 will be cashed out of the dissolved Company as if the Company had expelled the Member under Section 12, except that if the Company properly chooses to make installment payments, the obligation to make those payments will transfer to the Successor LLC as part of the merger contemplated by this article.

### ARTICLE XIV
### INDEMNIFICATION

## Section 14.01  Definitions

For purposes of this article, the terms defined in this section have the meanings given them.

(a)    "Company" includes any domestic or foreign company that was the predecessor of this Company in a merger or other transaction in which the predecessor's existence ceased upon consummation of the transaction.

(b)    "Official capacity" means (i) with respect to a manager, the position of manager in the Company, (ii) with respect to a person other than a manager, the elective or appointive office or position held by an officer, member of a committee of the Management Committee, if any, or the efforts undertaken by a Member of the Company who acts on behalf of and at the request of the Company, or the employment or agency relationship undertaken by an employee or agent of the Company, and (iii) with respect to a manager, member, officer, employee, or agent of the Company who, while a manager, officer, employee, or agent of the Company, is or was serving at the request of the Company or whose duties in that position involve or involved service as a manager, officer, partner, trustee, or agent of another organization or employee benefit plan, the position of that person as a manager, officer, partner, trustee, employee, or agent, as the case may be, of the other organization or employee benefit plan.

(c)    "Proceeding" means a threatened, pending, or completed civil, criminal, administrative, arbitration, or investigative proceeding, including a proceeding by or in the right of the Company.

(d)    "Special legal counsel" means counsel who has not represented the Company or a related company, or a manager, officer, member of a committee of the Management Committee, if any, employee, or agent whose indemnification is in issue.

## Section 14.02  Mandatory Indemnification; Standard

(a)    The Company will indemnify a person made or threatened to be made a party to a proceeding by reason of the former or present official capacity of the person against judgments, penalties, fines, including, without limitation, excise taxes assessed against the person with respect to an employee benefit plan, settlements, and reasonable expenses, including attorney fees and disbursements, incurred by the person in connection with the proceeding, if, with respect to the acts or omissions of the person complained of in the proceeding, the person

(i)   has not been indemnified by another organization or employee benefit plan for the same judgments, penalties, fines, including, without limitation, excise taxes assessed against the person with respect to an employee benefit plan, settlements, and reasonable expenses, including attorney fees and disbursements, incurred by the person in connection with the proceeding with respect to the same acts or omissions;

(ii)  acted in good faith;

(iii) received no improper personal benefit; and

(iv)  in the case of a criminal proceeding, had no reasonable cause to believe the conduct was unlawful; and

(v)   in the case of acts or omissions occurring in the official capacity it is reasonably believed that the conduct was in the best interests of the Company, or in the case of acts or omissions occurring in the official capacity it is reasonably believed that the conduct was not opposed to the best interests of the Company. If the person's acts or omissions complained of in the proceeding relate to conduct as a manager, officer, trustee, employee, or agent of an employee benefit plan, the conduct is not considered to be opposed to the best interests of the Company if the person reasonably believed that the conduct was in the best interests of the participants or beneficiaries of the employee benefit plan.

(b)   The termination of a proceeding by judgment, order, settlement, or conviction or upon a plea of nolo contendere or its equivalent does not, of itself, establish that the person did not meet the criteria set forth in this Section 14.02.

## Section 14.03 Advances

If a member is made or threatened to be made a party to a proceeding related to company affairs or business, the person is entitled, upon written request to the Company, to payment or reimbursement by the Company of reasonable expenses, including attorney fees and disbursements, incurred by the person in advance of the final disposition of the proceeding,

(a)   upon receipt by the Company of a written affirmation by the person of a good faith belief that the criteria for indemnification set forth in Section 14.02 have been satisfied and a written undertaking by the person to repay all amounts so paid or reimbursed by the Company, if it is ultimately determined that the criteria for indemnification have not been satisfied, and

(b)   after a determination that the facts then known to those making the determination would not preclude indemnification under this article.

The written undertaking required by paragraph (a) above is an unlimited general obligation of the person making it, but need not be secured and will be accepted without reference to financial ability to make the repayment.

## Section 14.04 Determination of Eligibility

(a)   All determinations as to whether indemnification of a person is required because the criteria stated in Section 14.02 have been satisfied and as to whether a person is entitled to payment

or reimbursement of expenses in advance of the final disposition of a proceeding as provided in Section 14.03 will be made by the Members, excluding the votes held by parties to the proceedings; or if an adverse determination is made or under paragraph (b), or if no determination is made under paragraph (b) within sixty (60) days after the termination of a proceeding or after a request for an advance of expenses, as the case may be, by a court in Nevada, which may be the same court in which the proceeding involving the person's liability is taking or has taken place, upon application of the person and any notice the court requires.

(b)    With respect to a person who is not, and was not at the time of the acts or omissions complained of in the proceedings, a manager, officer, or person possessing, directly or indirectly, the power to direct or cause the direction of the management or policies of the Company, the determination whether indemnification of this person is required because the criteria set forth in Section 14.02 have been satisfied and whether this person is entitled to payment or reimbursement of expenses in advance of the final disposition of a proceeding as provided in Section 14.03 may be made by the Members.

## Section 14.05 Insurance

The Company may purchase and maintain insurance on behalf of a person in that person's official capacity against any liability asserted against and incurred by the person in or arising from that capacity, whether or not the Company would have been required to indemnify the person against the liability under the provisions of this article.

## Section 14.06 Disclosure

The amount of any indemnification or advance paid pursuant to this article and to whom and on whose behalf it was paid will be included in the Required Records.

## Section 14.07 Discretionary Indemnification of Others

Nothing in this Article XIV limits the ability of the Manager to cause the Company to indemnify any person or entity not described in this Article XIV pursuant to, and to the extent described in, an agreement authorized by an act of the Manager.

## ARTICLE XV
## REMEDIES FOR BREACH

## Section 15.01 Specific Enforcement

Except for the provisions of Section 12.02, all breaches of this Agreement are subject to specific enforcement, without prejudice to the right to seek damages or other remedies.

## Section 15.02 Concurrent or Consecutive Causation of Damages

(a)    If two or more Members breach this Agreement and those breaches combine in any way, concurrently or consecutively, to produce harm to the Company, then those Members are jointly and severally liable to the Company for the entirety of the harm. This paragraph precludes a Member who has breached this Agreement from asserting that another Member's prior, contemporaneous, or subsequent breach constitutes a superseding, intervening, or independent cause or in any way releases the breaching Member from liability.

(b)    Section 15.02(a) does not preclude breaching Members from seeking contribution or indemnity from each other, or otherwise seeking to allocate among themselves the responsibility and liability for the harm caused to the Company.

### Section 15.03 Attorney Fees and Other Litigation Expenses

If the Company resorts to litigation to remedy a breach of this Agreement by a Member or former Member and the Company prevails in the litigation, in addition to any other remedies available to the Company under this Agreement or by law the Company may collect its reasonable attorney fees and other costs and expenses of litigation.

## ARTICLE XVI
## AMENDMENTS

### Section 16.01 Requirements for Amendments

To be effective, any amendment to this Agreement must be approved by an act of the Members reflecting approval by Members owning a majority of the Governance Units.

## ARTICLE XVII
## MISCELLANEOUS

### Section 17.01 Governing Law

This Agreement, and any question, dispute, or other matter related to or arising from this Agreement, will be governed by the laws of the State of Nevada.

### Section 17.02 Binding Effect

This Agreement binds all Members and their respective distributees, successors, and assigns and any other person claiming a right or benefit under or covered by this Agreement. Spouses and estates shall be bound by this agreement per Section 5.03 and any joint ownership shall be bound by this Agreement per Section 5.04.

### Section 17.03 Severability

If any provision of this Agreement is held to be illegal, invalid, or unenforceable,

(a)    that provision will be fully severable and this Agreement will be construed and enforced as if the illegal, invalid, or unenforceable provision had never been part of this Agreement;

(b)    the remaining provisions of this Agreement will remain in full force and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement; and

(c)    in the place of the illegal, invalid, or unenforceable provision, there will be added automatically to this Agreement a legal, valid, and enforceable provision that is as similar to the illegal, invalid, or unenforceable provision as possible.

### Section 17.04 Multiple Counterparts

This Agreement may be executed in several counterparts, each of which will be considered an original and all of which will constitute one and the same document. Proving the execution and contents of this document against a party may be done by producing any copy of this Agreement signed by that party.

### Section 17.05 Additional Documents and Acts

Each Member agrees to execute and deliver whatever additional documents and to perform such additional acts as may be necessary or appropriate to effectuate and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated by this Agreement.

### Section 17.06 Notices

(a)     Any notice to be given or made to the Company, its Manager or any Member must be in writing and will be considered to have been given when delivered to the address specified in the Company's Required Records.

(b)     A person who wants to change its address as specified in the Required Records may do so by giving written notice of the change to the Company and to each Member. The change takes effect five days after the notice is given.

### Section 17.07 Dispute Resolution

Any dispute arising out of this Agreement shall be settled by arbitration.  The manager shall appoint an arbitrator and the members holding fifty-one percent (51%) of Governance Units may appoint an arbitrator, if they do not agree to the arbitrator appointed by the Manager and any disputes shall be resolved by a binding arbitration.

### Section 17.08 Enforcement of Commitments.

By signing this document each Leveraged Member agrees to be personally liable for his proportionate share of the outstanding loan balance. Each Member agrees to be personally liable for his proportionate share of all other expenses.  In the event any Member fails to perform the Member's Commitment, such Member shall become a Delinquent Member and the Manager shall give the Delinquent Member a Notice of failure to meet the Commitment. If the Delinquent Member fails to perform the Commitment (including any costs associated with the failure to comply with the Commitment and interest on such obligation at the Default Interest Rate which after 30 days late will be 5% per month of the total amount due) within five (5) business days of the giving of Notice, the Manager may take such action as necessary to enforce the Commitment, including but not limited to enforcing the Commitment in the court of appropriate jurisdiction in the state in which the principal place of business is located or the state of the Delinquent Member's address as reflected in the membership roster.  Each Member expressly agrees to the jurisdiction of such courts.  The Manager may elect to allow the other Members to contribute the amount of the Commitment in proportion to such Members' Membership Interests, with those Members who contribute (the "Contributing Members") to contribute additional amounts equal to any amount of the Commitment not contributed.  Upon such contributions by the Contributing Members, the Membership Interests of all the Members shall be adjusted as follows: (i) the Delinquent Member's Membership Interest shall be reduced so that it is equal to the result (expressed as a percentage) obtained by dividing (A) the product of the Delinquent Member's Membership Interest multiplied by the total Capital Contributions made by all Members (not including the subject additional capital contribution), by

(B) the sum of the total Capital Contributions made by all Members (not including the subject additional capital contribution) plus 150% of the total of the subject additional capital contributions, and (ii) the Contributing Member's Membership Interest shall be increased by the amount of the reduction in the Delinquent Member's Membership Interest. For example, if the total capital contributions before an additional capital contribution were equal to $100,000, and if the additional capital contribution were equal to $10,000, a Delinquent Member with a 20% Membership Interest would have his Membership Interest reduced to seventeen percent (17%) ($20,000/$115,000), and the Contributing Member would have his Membership Interest increased from 80% to 83%. Notwithstanding the foregoing, no Commitment or other obligation to make an additional contribution may be enforced by a creditor of the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor. No action, either legal or reduction of Delinquent Members Membership shall be taken until Delinquent Member is delinquent for 90 days, except that late charges after 30 days late will still apply. Before that time Delinquent Member may pay all amounts due including late fees and any other charges that may be assessed.

## Section 17.09 Definitions

For purposes of this Agreement, unless the language or context clearly indicates that a different meaning is intended, the words, terms and phrases defined in this section have the following meanings:

      (a)    "Act of the members" has the meaning stated in Section 9.01.

      (b)    "Agreement" means this Operating Agreement, as amended from time to time under Article XVII.

      (c)    "Capital Account" means the account of any Member or Dissociated Member, maintained as provided in Section 6.02.

      (d)    "Capital Interest" means the right of any Member or dissociated Member to be paid the amount in that Member's or Dissociated Member's Capital Account.

      (e)    "Code" means the Internal Revenue Code of 1986, as amended, and any successor to that Code.

      (f)    "Company" means Tax Planning Institute, LLC, a Nevada Limited Liability Company, Organized under Nevada Revised Statutes Chapter 86.

      (g)    "Contribution Agreement" means an agreement between a person and the Company, under which:

          (i)    the person agrees to make a contribution in the future to the Company;

          (ii)    the Company agrees that, at the time specified for the contribution in the future, the Company will accept the contribution, reflect the contribution in the Required Records, issue to the person a specified number of Governance and Financial Units, and accord the person status as a Member (if the person is not already a Member).

      (h)    "Contribution Allowance Agreement" means an agreement between a person and the Company, under which:

Operating Agreement of
Tax Planning Institute, LLC

(i)      the member has the right, but not the obligation, to make a contribution to the Company in the future; and

(ii)     the Company agrees that, if the member makes the specified contribution at the time specified in the future, the Company will accept the contribution, reflect the contribution in the Required Records, issue to the person a specified number of Governance and Financial Units, and accord the person status as a Member (if the person is not already a Member).

(i)     "Core business" means the Company's general business.

(j)     "Default rule" means a rule stated in the Act:

(i)     which structures, defines, or regulates the finances, governance, operations, or other aspects of a limited liability company organized the Act, and

(ii)     which applies except to the extent it is negated or modified through the provisions of a limited liability company's articles of organization or operating agreement.

(k)     "Disinterested" means, with respect to a Manager or Member and with respect to a particular transaction or other undertaking, a Manager or Member who (i) is not a party to that undertaking, (ii) has no material financial interest in any organization that is a party to that undertaking, and (iii) is not related by blood or marriage to any person who either is a party to that undertaking or has a material financial interest in any organization that is a party to that undertaking.

(l)     "Dissociation of a Member" or "Dissociation" occurs when the Company has notice or knowledge of an event that has terminated a Member's continued Membership in the Company (including an event that leaves a Member without any Governance Units).

(m)     "Financial Units" has the meaning stated in Section 4.01.

(n)     "Fiscal Year" means the annual period upon which the Company files its federal tax return.

(o)     "Governance Units" has the meaning stated in Section 4.01.

(p)     "Limited Liability Company Act" means Sections 86.011 through 86.590, of Chapter 86, Nevada Revised Statutes, as amended from time to time.

(q)     "Manager" means a person, entity or trust, duly elected under Article VII to manage the business of the Company, as well as any person, entity or trust who serves in an interim capacity under that Article.

(r)     "Majority-In-Interest Consent" means the consent described in Revenue Procedure 94-46, 1994-28 IRB 129, as amended from time to time.

(s)     "Member" means a person who owns at least one Governance Unit and whose ownership of one or more Governance Units is reflected in the Required Records.

(t)     "Person" means an individual, company, joint venture, estate, association, corporation, trust company, trust or other legal entity.

(u)    "Required Records" means those records specified in Section 10.01.

(v)    "Successor LLC" means a limited liability company organized under Section 13.02 to participate as the surviving organization in a Merger with the Company after the Company Is Dissolved.

(w)    "Termination of the Company" Means, as agreed between the members , upon expiration of the LLC as provided in the Articles of Organization or as otherwise defined in Nevada Revised Statutes Chapter 86, the end of the Company's legal existence.

(x)    "Transfer" includes an assignment, conveyance, lease, mortgage, security interest, deed, encumbrance, and gift.

(y)    "Bankruptcy" shall mean, as to a person, the happening of any of the following:

   i.    the making by that person of an assignment for the benefit of creditors;

   ii.   the filing by that person of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing that person's inability to pay that person's debts as they become due;

   iii.  the entry of an order, judgment or decree by a court of competent jurisdiction adjudicating that person to be bankrupt or insolvent;

   iv.   the filing by that person of a petition or answer seeking for that person a reorganization, arrangement, compensation, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

   v.    the filing by that person of an answer or other pleading admitting the material allegations of, or that person's consenting to, or defaulting in answering, a bankruptcy petition filed against that person in any bankruptcy proceeding;

   vi.   the filing by that person of an application or other pleading or that member otherwise seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator of that person or all or any substantial part of that person's property;

   vii.  the commencement of any proceeding against that person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, or law or regulation, which has not been dismissed for any consecutive period of 120 days; or

   viii. the appointment without the consent or acquiescence of that person of a trustee, receiver or liquidator of that person or of all or substantially all of that person's properties (excluding any property to the extent it is subject to nonrecourse debt) without that appointment being vacated or stayed within 90 days or without that appointment being vacated within 90 days after the expiration of any such stay.

(z)    "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for that year or other period, except that if the agreed value of an asset differs from its adjusted basis for

federal income tax purposes at the beginning of the fiscal year or other period, depreciation shall be an amount which bears the same ratio to that different agreed value (as originally computed) as the federal income tax depreciation, amortization, or other cost recovery deduction for that fiscal year or other period bears to the adjusted tax basis (as originally computed); provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for the applicable year or period is zero, depreciation shall be determined with reference to the agreed value (as originally computed) using any reasonable method selected by the Management Committee.

(aa)    "Company Property" means any and all other property (real, intangible or personal) now or hereafter owned by the company or in, to or under which the company has any interest, right or claim.

(bb)    "Effective Date" means the later date on which this agreement is signed by all members and the articles of organization have been file with the Secretary of State or such other date as may be selected by the management committee.

(cc)    "Fiscal Year" means the year on which the accounting and federal income tax records are kept.

(dd)    "Internal Revenue Code":    "Internal Revenue Code" and "IRC" are used interchangeably to mean the Internal Revenue Code of 1986, as amended from time to time.

(ee)    "Minimum Gain" or "Company Minimum Gain" has the meaning set forth in section 1.704-1(b)(4)(iv)(c) of the Treasury Regulations.

(ff)    "Profits" and "Losses" means for each Fiscal Year or other period, an amount equal to the company's taxable income or loss for that year or period, determined in accordance with IRC section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to IRC section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

      i.      any income of the company exempt from federal income taxation not otherwise taken into account in computing Profits or Losses pursuant to this shall be added to that taxable income or loss;

      ii.      any expenditures of the company described in IRC section 705(a)(2)(B) or treated as IRC section 705(a)(2)(B) expenditures pursuant to Treasury Regulation section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing profits or losses pursuant to this Section shall be subtracted from that taxable income or loss;

      iii.      in the event the Agreed Value of any company asset is adjusted, the amount of that adjustment shall be taken into account as gain or loss from the disposition of that asset (assuming the asset was disposed of just prior to the adjustment) for purposes of computing profits or losses in the fiscal year of adjustment;

      iv.      gain or loss resulting from any disposition of company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the agreed value of the property disposed of, notwithstanding that the adjusted tax basis of that property may differ from its agreed value;

v.　　in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there shall be taken into account the depreciation for the fiscal year or other period, and

vi.　　notwithstanding any other provision of this section, any items of income or gain, loss or deduction which are specially allocated pursuant to sections 5.3 or 5.4 hereof shall not be taken into account in computing profits or losses.

(gg)　　"Transfer" means to sell, assign, transfer, give, donate, pledge, deposit, alienate, bequeath, devise or otherwise dispose of or encumber to any person. Any transfer occurring by operation of law, such as through incorporation, merger, consolidation or dissolution, shall be included in the definition of "transfer."

(hh)　　"Treasury Regulations" shall mean pronouncements which clarify, interpret and apply the provisions of the Internal Revenue Code and which are designated as "Treasury Regulations" by the United States Department of the Treasury.

(ii)　　"Vote" Each member shall have one vote for each voting share owned. With respect to decisions in which nonvoting members may participate, each member shall also have one vote for each nonvoting share owned.

### Section 17.10  Rights of Creditors and Third Parties under Operating Agreement.

This Operating Agreement is entered into among the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**ACCEPTED AND AGREED TO BY:**
**(as of the Effective Date set forth above)**

Tax Planning Institute, LLC ("the Company")

**BY: MANAGER:**

BY: BLUE OCEAN TRUST

By:　*Rao K. Manda*
Rao Garuda, Trustee

By:_____
Simon Singer, Trustee

By:_____
Brandon Stuerke, Trustee

v.   in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there shall be taken into account the depreciation for the fiscal year or other period, and

vi.   notwithstanding any other provision of this section, any items of income or gain, loss or deduction which are specially allocated pursuant to sections 5.3 or 5.4 hereof shall not be taken into account in computing profits or losses.

(gg)   "Transfer" means to sell, assign, transfer, give, donate, pledge, deposit, alienate, bequeath, devise or otherwise dispose of or encumber to any person. Any transfer occurring by operation of law, such as through incorporation, merger, consolidation or dissolution, shall be included in the definition of "transfer."

(hh)   "Treasury Regulations" shall mean pronouncements which clarify, interpret and apply the provisions of the Internal Revenue Code and which are designated as "Treasury Regulations" by the United States Department of the Treasury.

(ii)   "Vote" Each member shall have one vote for each voting share owned. With respect to decisions in which nonvoting members may participate, each member shall also have one vote for each nonvoting share owned.

**Section 17.10   Rights of Creditors and Third Parties under Operating Agreement.**

This Operating Agreement is entered into among the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**ACCEPTED AND AGREED TO BY:**
(as of the Effective Date set forth above)

Tax Planning Institute, LLC ("the Company")

BY:  MANAGER:

BY: BLUE OCEAN TRUST

By:_____
Rao Garuda, Trustee

By:_____
Simon Singer, Trustee

By:_____
Brandon Stuerke, Trustee

Operating Agreement of
Tax Planning Institute, LLC

Page 27

**MEMBERS:**

GARUDA FAMILY ASSET PROTECTION TRUST

By: _Rao K. Ganda_____
Rao Garuda, Trustee

By: _R R Ganda_____
Radha Garuda, Trustee

SIMON SINGER

_____
Simon Singer

BRANDON STUERKE

_____
Brandon Stuerke

Operating Agreement of
Tax Planning Institute, LLC

Page 28

MEMBERS:

GARUDA FAMILY ASSET PROTECTION TRUST

By:_____
Rao Garuda, Resources Trustee


By:_____
Radha Garuda, Resources Trustee

MARTIN JACKSON TRUST

By:_____
Simon Singer, Resources Trustee

BRANDON STUERKE
_____
Brandon Stuerke

## MEMBERSHIP INTERESTS

### Schedule A

| Member | Governance Units | Financial Units |
|---|---|---|
| Garuda Family Asset Protection Trust | 30 | 30 |
| Simon Singer | 30 | 30 |
| Brandon Stuerke | 40 | 40 |

Operating Agreement of
Tax Planning Institute, LLC

## MEMBERS CAPITAL CONTRIBUTIONS

### Schedule B

| Members | Initial Capital Contribution |
|---|---|
| Garuda Family Asset Protection Trust | |
| Simon Singer | |
| Brandon Stuerke | |